UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
                                    :
SUSAN BUTLER,                       :        16cv1282 (DLC)
                      Plaintiff,    :
                                    :        OPINION AND
           -v-                      :          ORDER
                                    :
NORMAN ROSS,                        :
                                    :
                      Defendant. :
------------------------------------X

APPEARANCES:

For the Plaintiff:
Barry R. Fischer
The Barry R. Fischer Law Firm LLC
555 Fifth Avenue, Suite 1700
New York, New York 10017

For the Defendant:
Martin Druyan
Martin Druyan & Associates
450 Seventh Avenue, Suite 3700
New York, New York 10123

DENISE COTE, District Judge:

     This case arises from plaintiff Susan Butler's ("Butler's")

request for an accounting of funds she entrusted to defendant

Norman Ross ("Ross") from 1987 to date.  In addition, Butler

seeks a money judgment in the amount found to be due and owing

from the accounting.[1]  Butler has filed a motion for summary

judgment pursuant to Rule 56, Fed. R. Civ. P.  Ross has filed a

cross-motion for summary judgment.  For the reasons that follow,

_____

[1] Specifically, Butler believes that she is entitled to
$721,257.53, plus prejudgment interest.

Butler's motion for summary judgment is granted in part, and Ross's motion for summary judgment is denied.

**BACKGROUND**

The following facts are undisputed unless otherwise noted. Butler is an Australian citizen and a resident of Montreal, Canada. She is the author of the "RAT Pack" workbooks and a former tenured professor at the University of Sydney. Ross is a 95 year-old American citizen and a resident of New York. Butler first met Ross in January 1987 aboard a QE2 cruise.[2]

On August 7, 1987, Butler purportedly executed a power of attorney to Ross. Indeed, a letter signed by Butler and dated August 2, 1988 acknowledges Ross as Butler's "general agent having a general power of attorney." When presented with the signed power of attorney during her October 18, 2016 deposition, Butler claimed that her signature was forged and that, to her knowledge, she had never executed a power of attorney to Ross.[3]

---

[2] A letter dated February 19, 1987 from Dominion Securities Inc. and addressed to "Mr. Ross" indicates that Ross began to inquire into Butler's finances either before or soon after meeting Butler aboard the QE2 cruise. The letter states: "Enclosed are statements as per your request for the accounts of Dr. Susan Butler from August 1981 to December 1986 . . . . I would suggest that if you wish to dig further into the trading activity in Susan's account that you contact our Operations Manager."

[3] Butler further postulates that Ross must have helped her write the August 2, 1988 letter, and, in the process, convinced her that she had in fact executed a power of attorney.

Ross offers no explanation for how he came to possess this power of attorney, nor does he attempt to defend its validity.

Ross began to manage Butler's finances in early 1988. A number of handwritten letters between August 1988 and October 1993 reveal that Ross possessed at least some of Butler's assets. For example, a letter dated August 1, 1988 addressed to Butler and signed by "Norman Ross" states in relevant part: "In the event of my death, my executors . . . will be able to assist you and answer any questions about the whereabouts of your assets that I am handling for you." A letter dated September 8, 1989 addressed to Butler and again signed by "Norman Ross" provides in relevant part: "This is a concise description of items of your property paid for with your personal funds that I am holding for you at this time as indicated below." Finally, an October 24, 1993 letter addressed to Butler and signed by "Norman Ross" states:

> As of 24 October 1993, I am holding cash of U.S. funds of $29,760.00 which is the property of Dr. Susan R. Butler. It is to be returned to her out of my estate in the event that it has not been returned or used for her expenses or otherwise put in a security in her name at or by the time of my death. If it is in a security in her name it is to be given to her if it is not already in her possession. Dr. Butler now possesses 4 Bonds in her name.
>
> The above statement cancels & supersedes any and all previous statements written or oral, of monies I am holding for or owe to Dr. Butler.

Ross can no longer recall signing these letters and
therefore contests their authenticity.  But, he does not dispute
that both he and Butler separately produced in discovery during
this litigation the following document signed by "Norman Ross":

> As of April 9, 1991, I am holding cash of U.S. funds
> of $11,380.66 which is the property of Dr. Susan R.
> Butler.  It is to be returned to her out of my estate
> in the event that it has not been returned to her or
> used for expenses or otherwise put it [sic] a security
> in her name at or by the time of my death.  If it is
> in a security in her name that I am holding in amount
> above or so -- it is, (the security) is to be given
> her after my death, from my vault, together with any
> other securities (2) in her name in my vault.
>
> This above statement cancels & supersedes any previous
> statements written or oral of monies I am holding for
> or owe to Dr. Susan R. Butler.  In other words, I owe
> her $11,380.66 in U.S. funds which I am holding for
> her as of 4/9/91 -- also I have in my vault at
> Crossland Savings 5 Ave & 89th N.Y.C. 2 U.S. securities
> in her name, paid with her funds and in her name which
> are both the property of Dr. Butler.
>
> The above statements will be [illegible] from time to
> time as monies ($11,380.66) are used on Dr. Butler's
> behalf for expenses, or purchases for her of any kind
> requested by her and new statements like this will be
> forthcoming from time to time to reflect changes.

Several financial documents produced by Ross during
discovery further demonstrate Ross's access to, and control
over, Butler's assets.  For example, Ross produced a notice from
HSBC dated March 21, 2005 and addressed to Susan R. Butler at
P.O. Box 58 Cooper Station, New York -- Ross's P.O. Box address.
The notice requests that Ms. Butler submit a completed Form W-

4

8BEN, which is a "Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding." Attached to the letter is a completed form with Butler's alleged signature. Butler claims that her signature is forged and that she has never before seen this letter.

Ross also produced an introductory letter from the Merrill Lynch Financial Advisory team. The letter is dated April 3, 2006, and is addressed to "Mrs. Butler" at P.O. Box 58, Cooper Station, New York. Enclosed is an account statement for "Susan R Butler c/o Norman Ross." On September 16, 2016, counsel for the plaintiff subpoenaed Merrill Lynch for all of Ms. Butler's account records. On September 30, Merrill Lynch responded to the subpoena, noting that it had "conducted a thorough search of [its] business records for responsive documents," but that "[n]o such records have been found under the name(s) and/or social security/taxpayer identification number(s) provided." With the defendant's permission, plaintiff's counsel subsequently subpoenaed Merrill Lynch for accounts in Ross's name or social security number. The responsive account statements show an account in Ross's name that was opened in March 2006 and that peaked at over a million dollars in 2010.

Ross has provided no response to the above-mentioned communications from HSBC and Merrill Lynch, or to Butler's

contention that her signature on the W-8BEN form is forged.  Nor
has Ross explained how he came to accumulate over one million
dollars in his Merrill Lynch account.[4]

In 2012, after learning that Ross had amended his will and
reduced her bequest by half, Butler orally demanded that Ross
return her money.  When Ross did not return the money, Butler
wrote to Ross requesting that the defendant inform her of the
location of her securities.[5]  On September 5, 2014, the
plaintiff's brother -- Anthony Butler -- wrote a follow-up
letter demanding that Ross return Butler's securities.  On
September 24, 2015, Butler's counsel wrote a letter to Ross
explaining that he had been retained to conduct a "thorough
investigation" into Ross's handling of Butler's financial and
business affairs and to recover whatever assets Ross was holding
on Butler's behalf.  The letter warned that Butler would file
suit against Ross if he did not voluntarily comply with her
investigative efforts within two weeks.[6]

---

[4] During his October 7, 2016 deposition, Ross maintained that he
was "never wealthy" and "always on the ropes."  He claims for
the first time in opposition to the plaintiff's motion that he
worked his whole life as a manager at a paralegal school in New
York and received monthly social security payments.  He offers
no documentary proof of either of these sources of income.

[5] The written demand is undated.

[6] At the same time that her counsel sent a demand for an
accounting, Butler, "in an abundance of caution," undertook

6

Butler filed this lawsuit on February 19, 2016. The complaint pleads only one count seeking an accounting. On April 12, Ross filed a motion to dismiss the complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P. The motion to dismiss was denied on June 14. On November 17, Butler filed a motion for summary judgment. In addition to an accounting, Butler seeks a money judgment in the amount found to be due and owing from the accounting. Specifically, Butler asserts that the documents produced in connection with this motion prove that she is entitled to $721,257.53. A cross-motion for summary judgment was filed on December 14, 2016. The motions became fully submitted on January 18, 2017.

## DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Smith v. Cty. Of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (citation omitted). The moving party bears the burden of

---

steps to "have a cancellation of the power of attorney served upon [the] defendant," even though she maintains that she never executed a power of attorney to the defendant.

demonstrating the absence of a material factual dispute. Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 456 (1992); Gemmink v. Jay Peak Inc., 807 F.3d 46, 48 (2d Cir. 2015).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in [Rule 56], must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or conjecture as to the true nature of the facts." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).

## I.    Accounting Cause of Action

Under New York law,[7] a party seeking an accounting under must establish four conditions:

(1) relations of a mutual and confidential nature;

(2) money or property entrusted to the defendant imposing upon him a burden of accounting;

(3) that there is no adequate legal remedy; and

(4) in some cases, a demand for an accounting and a refusal.

Butler, 2016 WL 3264134, at *2 (citation omitted).  The right to an accounting is "premised upon the existence of a confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest."  Dee v. Rakower, 976 N.Y.S.2d 470, 478 (App. Div. 2013) (citation omitted).

An accounting under New York law is an equitable claim. When a party bringing an accounting claim primarily seeks monetary damages, "[t]he accounting is merely a method to determine the amount of the monetary damages.  The action therefore sounds in law and not in equity."  Arrow Commc'n Labs., Inc. v. Pico Prods., Inc., 632 N.Y.S.2d 903, 905 (App.

_____

[7] The Court has previously applied New York law to this claim. See Butler v. Ross, 16cv1282 (DLC), 2016 WL 3264134, at *2 (S.D.N.Y. June 14, 2016).  The parties do not contest the Court's choice of law analysis.

Div. 1995) (citation omitted).  Where, however, the action seeks
"not to impose personal liability on the defendant, but to
restore to the plaintiff particular funds or property in the
defendant's possession," such action is an equitable claim for
restitution.  Pereira v. Farace, 413 F.3d 330, 340 (2d Cir.
2005) (citation and emphasis omitted).

The statute of limitations in New York for an accounting
claim is six years.  Golden Pac. Bancorp v. FDIC, 273 F.3d 509,
518 (2d Cir. 2001); Matter of Barabash, 31 N.Y.2d 76, 80 (1972);
N.Y. C.P.L.R. § 213.  The limitations period for claims arising
out of a fiduciary relationship does not commence "until the
fiduciary has openly repudiated his or her obligation or the
relationship has been otherwise terminated."  Golden Pac.
Bancorp, 273 F.3d at 518 (citation omitted).

### A.   A Confidential or Fiduciary Relationship Existed Between the Plaintiff and the Defendant.

A fiduciary relationship, "whether formal or informal, is
one founded upon trust or confidence reposed by one person in
the integrity and fidelity of another and might be found to
exist, in appropriate circumstances, between close friends or
even where confidence is based upon prior business dealings."
Lawrence v. Kennedy, 944 N.Y.S.2d 577, 580 (App. Div. 2012)
(citation omitted).  "It is said that the relationship exists in
all cases in which influence has been acquired and abused, in

10

which confidence has been reposed and betrayed." <u>Penato v.</u>
<u>George</u>, 383 N.Y.S.2d 900, 904 (App. Div. 1976). A fiduciary
relationship is also said to exist "when confidence is reposed
on one side and there is resulting superiority and influence on
the other." <u>United States v. Chestman</u>, 947 F.2d 551, 568 (2d
Cir. 1991) (citation omitted). Thus, the rule "embraces both
technical fiduciary relations and those informal relations which
exist whenever one man trusts in, and relies upon, another."
<u>Penato</u>, 383 N.Y.S.2d at 904-05.

A power of attorney creates a fiduciary relationship
between the principal and her agent. <u>Butler</u>, 2016 WL 3264134,
at *2. While a power of attorney is sufficient to establish a
fiduciary relationship, it is not necessary. Here, the parties
appear to agree that the power of attorney allegedly executed by
Butler in favor of Ross is not valid. Nevertheless, based on
the above-described letters and financial documents, no
reasonable juror could decline to find that a fiduciary
relationship existed between Butler and Ross.

For example, the April 9, 1991 letter produced separately
by both parties clearly demonstrates that Ross acquired control
over Butler's assets. In the letter, Ross states that he is
holding in his vault U.S. securities in Butler's name and paid
for with Butler's funds. The letter further states that the

balance of monies owed to Butler may change "from to time as monies ($11,380.66) are used on Dr. Butler's behalf for expenses, or purchases for her of any kind requested by her." As this note clearly demonstrates, Ross held Butler's securities on her behalf and would make certain purchases at her request.

Account statements produced by Ross further reveal the extent of the defendant's access to Butler's funds.  For example, a 2006 account statement from Lebenthal lists an account with a net portfolio value of $299,976.05 in the name of "SUSAN BUTLER TOD ACCT C/O N ROSS."  Letters from HSBC and Merrill Lynch are similarly addressed to "Susan Butler" at the defendant's P.O. Box address.

It is also indisputable that Butler trusted Ross to help manage her affairs.  Not only did she list Ross's P.O. Box address as contact information for her RAT Pack workbooks, but she also trusted Ross to purchase securities on her behalf.

Thus, it is clear from the documentary evidence that Butler reposed trust in Ross, and that Ross acquired influence over Butler's affairs.  Accordingly, Butler has shown that a fiduciary relationship existed between herself and the defendant.

**B.    Butler Entrusted Money to Ross.**

The April 9, 1991 letter written by Ross and separately

produced by both parties clearly demonstrates that Butler

entrusted money to Ross.  As the letter states, "As of April 9,

1991, I [Norman Ross] am holding cash of U.S. funds of

$11,380.66 which is the property of Dr. Susan R. Butler."

**C. Butler Does Not Have an Adequate Legal Remedy.**

Under New York law, an accounting claim is improper where

money damages are recoverable under an alternative cause of

action for the same injury.  Here, where there is no apparent

contract between the parties, and where Butler lacks critical

information that would enable her to plausibly plead any

alternative legal claim, an accounting is Butler's only

available remedy.

**D. Ross Never Responded to Butler's September 24, 2015 Demand for an Accounting.**

On September 24, 2015, plaintiff's counsel wrote a letter

to Ross requesting that he voluntarily submit to an

investigation and accounting of the plaintiff's financial

affairs.  Ross failed to respond to Butler's demand or submit to

the requested accounting.[8]  Accordingly, Butler is entitled to an

accounting of the funds entrusted to Ross.

---

[8] Butler and her brother had previously sent letters in or around 2014 requesting that Ross reveal the whereabouts of Butler's securities.  It was not until plaintiff's counsel's September 2015 letter, however, that Butler formally demanded that Ross submit to an accounting.

13

## II. Affirmative Defenses

Ross seeks summary judgment on the basis of several affirmative defenses, all of which lack merit. For the reasons explained below, Ross's cross-motion for summary judgment is denied.

### A. Statute of Limitations

Ross argues that Butler's accounting claim is barred by the six-year statute of limitations. Ross asserts that the statute of limitations began to run at four alternative times. First, Ross argues that Butler knew or should have known of the breach of fiduciary duty in 1997, when Ross allegedly stole Butler's severance payment from the University of Sydney, her Australian tax refund, and royalties from sales of her RAT Pack booklets. Second, Ross asserts that the statute began to run in 1999, when the defendant allegedly shut down Butler's bank account and took all the money from it. Third, Ross claims that the statute began to run in or around 2006, when Butler purchased a Montreal townhouse. As Ross explains, Butler had "an inquiry duty to obtain information about her alleged investments when she needed the funds to purchase said townhouse."[9] Finally, Ross asserts

---

[9] In the alternative, Ross argues that it is "a logical inference" that Butler used monies repaid to her by the defendant to purchase her Montreal property. Ross speculates that Butler "paid down approximately $300,000 in cash and an additional $365,000 loan which [] she paid back in 2007. This

that the limitations period commenced in 2010, when Anthony

Butler allegedly called the defendant's former attorney to

inquire into revisions to the defendant's will.[10]

The statute of limitations for claims arising out of a

fiduciary relationship is triggered not when the plaintiff had

notice inquiry of her fiduciary's breach.  Rather, the statute

of limitations is triggered when the "fiduciary has openly

repudiated his or her obligation or the relationship has been

otherwise terminated."  Golden Pac. Bancorp, 273 F.3d at 518

(citation omitted).  Mere speculation about when Butler could or

should have known about Ross's mismanagement of her finances

---

is the approximate total of all the monies . . . she claims
Defendant owes her."  Mere speculation about the origin of the
funds the plaintiff used to purchase her Montreal townhouse is
insufficient to establish that Butler recouped the money owed to
her by the defendant.  See Hicks, 593 F.3d at 166 (providing
that "mere speculation or conjecture as to the true nature of
the facts" is insufficient to overcome a motion for summary
judgment).

[10] Ross's former attorney's billing records contain an entry on
August 5, 2010 that states the following:
     Received telephone call with [] Tony Butler (Susan's
     brother) from Montreal . . . inquiring about if social
     services is seeing client; phone call with client for
     status - left message, etc."
Anthony Butler declares that he "never called [Ross's former]
attorney Stuart Shaw on August 5, 2010 or on any other date."
Moreover, when questioned about this call, the defendant's
former attorney testified that he could not recall the identity
of the caller, that he had never previously had contact with
Anthony Butler, and that he could not recognize the voice of
Anthony Butler.

does not trigger the limitations period.  Ross did not openly
repudiate his fiduciary obligation until September 2015, when he
failed to respond to Butler's counsel's request that he submit
to a voluntary accounting.

### B.    Doctrine of Laches

Ross urges that Butler's equitable accounting claim is
barred by the doctrine of laches.  Laches is defined as "such
neglect or omission to assert a right as, taken in conjunction
with the lapse of time, more or less great, and other
circumstances causing prejudice to an adverse party, operates as
a bar in a court of equity."  Capruso v. Village of Kings Point,
23 N.Y.3d 631, 641 (2014) (citation omitted).  "The essential
element of this equitable defense is delay prejudicial to the
opposing party."  Id. (citation omitted).  Summary judgment on
this issue is denied.  Ross shall have an opportunity to argue
whether Butler's claim is barred by the doctrine of laches at
trial.

### C.    Doctrine of Unclean Hands

Ross argues that Butler's equitable accounting claim is
barred by the doctrine of unclean hands.  The doctrine of
unclean hands applies only "when the complaining party shows
that the offending party is guilty of immoral, unconscionable
conduct and even then only when the conduct relied on is

16

directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct."  <u>Filan v. Dellaria</u>, 43 N.Y.S.3d 353, 359 (App. Div. 2016) (citation omitted).

Here, Ross contends that Butler demonstrated immoral and unconscionable conduct through a "campaign of death threats." In support of this argument, Ross quotes selectively from Butler's letters and October 18, 2016 deposition transcript. These quotes, read in context, do not demonstrate immoral, unconscionable conduct.  Nor can Ross plausibly contend that he was injured by these statements.

First, Ross asserts that the following excerpt from Butler's undated, typed letter inquiring into the whereabouts of her securities constituted a threat: "If you tell me where my securities are, there will not be another attack."  But as this portion of the letter states in full:

> About two weeks ago I was attacked by someone trying to prevent me from locating the securities.  You may be attacked for the same reason.  If you tell me where my securities are, there will not be another attack.

Furthermore, a handwritten annotation at the bottom of the letter states: "Trust you are well.  Happy these ladies are there to help."  The letter is signed "Love, Sue."

Similarly, Ross quotes the following excerpt from Anthony Butler's September 5, 2014 letter, which Ross also claims

constituted a threat: "You will not be safe until you tell us what is going on."  The complete excerpt from Anthony Butler's letter states:

> It seems to me that you have an accomplice who may now be in possession of some or all of my sister's assets in this matter.  You are refusing to tell us who it is out of spite or fear.  If there is such a person and I think there is, that person does not know that we have proof of the claim.  My sister thinks that they will kill you.  I believe they may break in and take your papers.  There is enough money involved for these things to happen.  You will not be safe until you tell us what is going on.  You need a lawyer.

The documents do not, upon examination, demonstrate that the plaintiff or her brother threatened to kill Ross.  Rather, these letters demonstrate the Butlers' concerns about future attacks at the hands of a third party interested in stealing the plaintiff's money.

Butler's statements during her deposition similarly do not demonstrate immoral or unconscionable conduct.  For example, during her October 18, 2016 deposition, Butler began laughing at the phrase "death by pillow," in reference to how "[s]omebody could come in and just smother [the defendant], and nobody would be any wiser because they wouldn't do an autopsy on an older person."  At no point did Butler imply that she intended to smother the defendant with a pillow; rather, as she explained during her deposition, "it is somewhat of a joke because I think he is in danger; that is why I think he should be in an

institution."  In addition, based on her evaluation of Ross's videotaped deposition, Butler speculated that Ross was lying about his medical symptoms and that "he wants attention, so he loved that videotaping."

At no point did Butler directly threaten the defendant with violence or intimate that she would take any unlawful action against the defendant.  Moreover, Ross cannot plausibly allege that he was injured by Butler's words.  The mere expression of indifference, frustration, or concern -- without more -- does not constitute a cognizable injury for purposes of the doctrine of unclean hands.

Finally, Ross contends that Butler is barred from seeking an equitable accounting because she allegedly violated U.S. tax law by transferring $29,000 from Australia to the United States. Butler's alleged tax violations are not related to her request for an accounting, nor did they injure Ross.

### D.    The Nature of Butler's Claim

Ross repeatedly attempts to recast Butler's claim as a premature claim for breach of contract to make a will bequest. But the documentary evidence establishes that the plaintiff is seeking her own money -- not Ross' property.  Accordingly, Butler need not wait until Ross's will comes into effect to attempt to recover her own property.

Ross also argues that Butler's claim for an accounting sounds in theft and conversion and is thus untimely. That Ross may have converted Butler's funds in addition to breaching his fiduciary obligation does not deprive Butler of her entitlement to an accounting.

### E.    New York Mental Hygiene Law and Due Process

Ross argues that a money judgment in favor of Butler will result in his insolvency and deprive him of his ability to receive care from a guardian in violation of § 81 of New York's Mental Hygiene Law and the Due Process Clause of the United States Constitution. As discussed below, Butler's request for a money judgment is denied; accordingly, the merits of this argument need not be addressed.

### III. Butler's Request for a Money Judgment

Butler seeks a partial judgment in the amount of $721,257.53 plus prejudgment interest. She claims that "even without the further assistance of forensic accountants," she can determine with "a reasonable degree of certainty" that Ross, at a minimum, owes her this sum. As detailed previously, however, there is significant dispute over the amounts entrusted to Ross and the amounts owed to Butler. Thus, summary judgment on the amount owed to Butler is inappropriate.

## CONCLUSION

The plaintiff's motion for summary judgment is granted in part. The plaintiff is entitled to an accounting, but the request for an immediate money judgment in the sum of $721,257.53 is denied. Trial will be held to determine the amount owed to the plaintiff. Ross may argue his defense of laches at trial. The defendant's cross-motion for summary judgment is denied.

Dated:    New York, New York
          July 11, 2017

                                    _____
                                           DENISE COTE
                               United States District Judge

21