UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                     :
SUSAN BUTLER,                        :           16cv1282 (DLC)
                        Plaintiff,   :
                                     :           OPINION AND ORDER
            -v-                      :
                                     :
NORMAN ROSS,                         :
                                     :
                        Defendant.   :
                                     :
------------------------------------ X

APPEARANCES:

For the Plaintiff:
Barry R Fisher
The Barry Fischer Law Firm LLC
555 Fifth Avenue
Suite 1700
New York, NY 10036

For the Defendant:
Martin Druyan
Martin Druyan and Associates
405 7th Avenue
New York, NY 10123

DENISE COTE, District Judge:

     This diversity action arises from a dispute between

plaintiff Susan Butler ("Butler") and her fiduciary, defendant

Norman Ross ("Ross").  Following a bench trial, it is determined

that Butler is entitled to restitution in the amount of $350,200

from Ross with prejudgment interest.

## PROCEDURAL HISTORY

Butler filed this lawsuit on February 19, 2016. Butler is an Australian citizen and a resident of Montreal, Canada. The complaint pleads only one count seeking an accounting. A motion to dismiss was denied on June 14, 2016. Butler v. Ross, 2016 WL 3264134 (S.D.N.Y June 14, 2016). On July 11, 2017, Butler's motion for summary judgment was granted in part. Butler v. Ross, 2017 WL 2963497 (S.D.N.Y. July 11, 2017). The Opinion held that Butler was entitled to an accounting, but the request for an immediate money judgment was denied. Id. at *8.

A bench trial was held October 26, 2017 to determine the amount of restitution to which Butler is entitled. Without prior objection from the parties, the trial was conducted in accordance with the Court's customary practices for non-jury proceedings, which includes taking direct testimony from witnesses through affidavits submitted with the parties' pretrial order submissions.[1] Butler submitted her own affidavit and the affidavit from handwriting expert Patricia Siegel. Ross submitted his own affidavit. The parties also served copies of exhibits that they intended to offer as evidence in chief at trial.

---

[1] At trial, defense counsel requested for the first time that the plaintiff and the defendant be required to present their direct testimony live. The untimely request was denied.

At trial, the plaintiff called two witnesses: Susan Butler and Patricia Siegel. They both swore to the truth of their previously submitted affidavits and were cross-examined. Ross's affidavit was received as his direct testimony; he was not cross examined. The trial record reflects which documents were offered as trial evidence and received as such.

This Opinion presents the Court's findings of fact and conclusions of law. The findings of fact appear principally in the following Background section, but also appear later in the Opinion. The issue of the defendant's competency is addressed at the end of the Opinion.

## BACKGROUND

Susan Butler was born in Montreal, Canada, received a doctorate from the University of London in England, and spent her career working in Australia. She became a Professor at the University of Sydney. She retired in 1996. During that time, Butler also worked as a clinical psychologist in private practice. She earned what she characterizes as "considerable income" from a self-published workbook series for learning disabled children entitled RATPACK.

Beginning in roughly 1986, and continuing until 1998, Butler gave some of her earnings to Ross to invest on her behalf. Butler has not offered at this trial any

contemporaneously created documents, such as checks or wire transfer records, that record those transfers to Ross. Instead, she has relied almost exclusively upon fragmentary financial records and documents in Ross's handwriting that reflect his receipt of various amounts from Butler. Of particular importance, Ross gave Butler a handwritten list of the amounts he received from her. The 26 entries on that list, which range in dates from February 17, 1986 to May 20, 1998, reflect a total transfer to Ross of $212,248.93 ("Summary Accounting").[2] Many of the entries on the Summary Accounting include a check number for checks issued from Butler's account at the National Australian Bank ("NAB").

In addition to checks issued by NAB, the Summary Accounting reflects 2 transfers in a total amount of $4,100 from Dominion Securities; 1 transfer in a total amount of $4,500 from Butler's friend, Helen Findlay; 1 transfer from a traveler's check for $300; and 1 transfer of $7,131.74, although the method of that transfer is unclear. Butler explains that the Dominion Securities account was an account that her father had created for her in Montreal. Butler testified that the $7,131.74

---

[2] Butler's typed version of Ross's handwritten list omits one entry from the handwritten list, a $602.69 transfer from January 24, 1995. The correct total amount from Ross's list is $212,248.93, not $211,646.24.

4

transfer came from the disposition of household items from her
mother's house.

In four handwritten documents, which bear dates between
1988 and 1993, Ross acknowledges that he has received money from
Butler, intends to invest or otherwise manage it for her, and
will eventually return it to her.  In the event he dies before
it has been returned, he explains that he has instructed the
executors of his will to return the money to her.

I. The Letters

a. August 1, 1988

Ross wrote Butler a handwritten letter on August 1, 1988.
It lists three executors for his estate "to assist you and
answer any question about the whereabouts of your assets that I
am handling for you."

b. September 8, 1989

On September 8, 1989, Ross wrote Butler a handwritten
letter describing four "items of your property paid for with
your personal funds that I am holding for you."  They are: (1)
$21,000 in "stripped U.S. bonds, called CATS and TIGR" bought by
Ross for Butler in 1987 and 1988; (2) "$10,500 in U.S. funds
plus $50 additional totaling $10,550;" (3) "$56,00 in Australian
funds which is worth $4,172 . . . in U.S. Funds;" (4) "A $6,000
bank check in U.S. funds."  The letter concludes, "therefore,
the total of U.S. funds belonging to you that I am holding for

you at this date is $10,550 plus $4,172 + $6,000, totaling

$20,722 U.S."

c. April 9, 1991

In an April 9, 1991 handwritten document ("1991 Letter")

Ross states that he is "holding" $11,380.66 belonging to Butler.

The document reads in pertinent part:

> $11,380.66 . . . is to be returned to her out of my estate.
> [I]n the event that it has not been returned to her or for
> expenses or otherwise put it a security in her name at or
> by time of my death.  If it is in a security in her name
> that I am holding in amount above or so.  It is (the
> security) is to be given [to] her after my death, from my
> vault, together with any other securities (2) in her name
> in my vault.

It is signed Norman Ross in several places.  The 1991 Letter is

particularly important to this litigation since Ross produced a

duplicate of this letter from his own files during discovery.

d. October 24, 1993

In an October 24, 1993 handwritten letter, Ross

acknowledged that as of that date he was holding $29,760 of

Butler's property.  Echoing language from the 1991 Letter, Ross

writes:

> It is to be returned to her out of my estate in the event
> that it has not been returned or used for her expenses or
> otherwise put in a security in her name at or by the time
> of my death.  If it is in a security in her name it is to
> be given to her if it is not already in her possession.
> Ms. Butler now possess 4 Bonds in her name.

II. The Bonds

Sometime after 1998 but before Butler permanently moved to Canada in 2007, Ross gave her a one page handwritten document listing five securities that he was holding for her, and photocopies of the five bonds.  They are: (1) "Zero Coupon Principal TIGR 000009," (2) "CATS 1107923," (3) "CATS 1107432," (4) "TIGR Rr5156," (5) "Zero Coupon Treasury Obligation Int." It appears that items one through four on this handwritten document refer to the bonds referenced in Ross's September 8, 1989 letter to Butler.  Based on the information contained in Ross's handwritten list and the incomplete photocopies of the bonds, the evidence indicates the following:

(1) Zero Coupon Principal TIGR: Purchased November 7, 1985. Paid $11,817.50.  Maturity date of May 15, 2004 at $50,000.
(2) CATS 1107923: Unclear when purchased.  Unclear what amount paid.  Maturity date of May 14, 2004 at $50,000.
(3) CATS 1107432: Purchased May 5, 1987.  Paid $10,524. Maturity date of May 15, 2009 at $25,000.
(4) TIGR Rr5156: Purchased November 7, 1984.  Paid $11,817.50. Maturity date of May 15, 2004 at $50,000.
(5) Zero Coupon Treasury Obligation Interest: Unclear when purchased.  Paid $10,000.  Maturity date of May 5, 2000 at $20,000.

The decipherable serial numbers found on the photocopies of the bonds match the serial numbers in the handwritten list of bonds. While much of the precise details of the bonds remain unclear, the evidence indicates that there existed five bonds, apparently purchased in or before 1987, all in Susan Butler's name, which had a total value of $195,000 upon maturity.

III. Handwriting Analysis

The Summary Accounting and these other documents were all written by Ross. This is confirmed in several different ways. One, a copy of the 1991 Letter was produced in discovery from Ross's files. The writing on this document is entirely consistent with the writing on the Summary Accounting and the other documents described above. This similarity extends to Ross's signature on the 1991 Letter and on the 1988, 1989, and 1993 letters. Moreover, both the 1993 and 1991 letters make reference to past communications written by Ross to Butler.[3] The similarity in handwriting is apparent to the untutored eye, but is confirmed by testimony from plaintiff's handwriting expert. In her expert report, Patricia Siegel states "with a reasonable degree of certainty" that Ross wrote the letters dated August 2, 1988, September 9, 1989, and October 24, 1993. She explains that this level of certainty is a "definite conclusion of identity." To make this determination, she used the 1991 Letter, printed in various levels of darkness, as a known exemplar. At trial, the defendant did not cross—examine Siegel regarding her determinations.

---

[3] From the October 24, 1993 letter: "The above statement cancels and supersedes any and all previous statements written or oral, of moneys I am holding for or owe to Dr. Butler." From the April 9, 1991 letter: "The above statement cancels and supersedes any previous statements written or oral of moneys I am holding for or owe to Dr. Susan R. Butler."

IV. Lebenthal Account

At some point, Ross opened an investment account in Butler's name at Lebenthal.  The account was "in care of" Norman Ross.  An incomplete account statement for the period January through March 2006 reflects that the account held $380,000 in fixed income securities for Butler's benefit.  The securities were transferred out of the account on March 11, and the account value was "0" as of March 31, 2006.  The account summary is reproduced here:

| Date | Account Type | Transaction | Quantity | Description |
|------|--------------|-------------|----------|-------------|
| 11-Mar | Cash | ASSET TRF | ($82,000.00) | Cert Accrual Ser Q 05/07<br>Treas Secs Int Pmt<br>CPN o.ooo% Due 05/15/07<br>CUSIP 156884VS4<br>ACCT# 970503 |
| 11-Mar | Cash | ASSET TRF | ($75,000.00) | Cert Accrual Ser Q 05/09<br>Treas Secs Int Pmt<br>CPN o.ooo% Due 05/15/09<br>CUSIP 156884VW5<br>ACCT# 970503 |
| 11-Mar | Cash | ASSET TRF | ($50,000.00) | US Treas Strips 11/11<br>Interest PMT<br>Due 11/15/11<br>DTD 11/15/85<br>CUSIP 912833JX9<br>ACCT# 970503 |
| 11-Mar | Cash | ASSET TRF | ($58,000.00) | US Treas Strips 11/15/08<br>Interest PMT<br>Due 11/15/08<br>DTD 11/15/84<br>CUSIP 912833GD8<br>ACCT# 970503 |
| 11-Mar | Cash | ASSET TRF | ($41,000.00) | US Treas Strips 11/12<br>Interest PMT<br>Due 11/15/12<br>DTD 11/15/85<br>CUSIP 912833JZ4<br>ACCT# 970503 |
| 11-Mar | Cash | ASSET TRF | ($39,000.00) | US Treas Strips 11/10<br>Interest PMT<br>Due 11/15/10<br>CUSIP 912833JV3<br>ACCT# 970503 |
| 11-Mar | Cash | ASSET TRF | ($35,000.00) | US Treas Strips 08/13<br>Interest PMT<br>Due 08/15/13<br>CUSIP 912833DE7<br>ACCT# 970503 |

The trial record contains no documentary evidence regarding the disposition of these assets worth $380,000. But, with the exception of $28,000, Ross never provided these funds or securities to Butler. Indeed, Butler never knew the account's existence until this litigation.

V. Butler's Return to Canada

Sometime around 2006, Butler left Australia and moved to what has become her permanent residence in Montreal, Canada. In 2006, she purchased a home in Montreal for approximately 600,000 CAD. Before leaving Australia for Canada, she copied the Summary Accounting and other documents she had received from Ross.

Ross made two payments to Butler in 2011. He paid her $18,000 on May 31, 2011 from his personal Merrill Lynch account, and he paid her another $10,000 in August 2011. At trial, Ross's counsel produced eighteen traveler's checks in the amount of $100 each which Butler had previously given to Ross. Butler agreed to accept these checks and to offset the amount of restitution she seeks with the total $1,800.

## DISCUSSION

After summary judgment, the issues remaining to be tried were the amount owed to the plaintiff and the defendant's affirmative defenses of laches and unclean hands. Butler v.

Ross, 2017 WL 2963497, at *8 (S.D.N.Y. July 11, 2017). Those issues are addressed below and in that order.

I. The Accounting

Under New York law,[4] a party seeking an accounting must establish four conditions:

> (1) relations of a mutual and confidential nature;
> (2) money or property entrusted to the defendant imposing upon him a burden of accounting;
> (3) that there is no adequate legal remedy; and
> (4) in some cases, a demand for an accounting and a refusal.

Butler, 2017 WL 2963497, at *4 (citation omitted). The right to an accounting is "premised upon the existence of a confidential or fiduciary relationship and a breach of the duty imposed by the relationship respecting property in which the party seeking the accounting has an interest." Dee v. Rakower, 976 N.Y.S.2d 470, 478 (2d Dep't 2013) (citation omitted). At the summary judgment stage, the Court held that Butler is entitled to an accounting. Butler, 2017 WL 2963497, at *8.

Butler's claim for an accounting under New York law is an equitable claim. When a party bringing an accounting claim primarily seeks monetary damages, "[t]he accounting is merely a method to determine the amount of the monetary damages. The

---

[4] New York law applies to this claim. See Butler v. Ross, 16cv1282 (DLC), 2017 WL 2963497, at *4 (S.D.N.Y July 11, 2017); Butler v. Ross, 16cv1282 (DLC), 2016 WL 3264134, at *2 (S.D.N.Y. June 14, 2016).

action therefore sounds in law and not in equity." Arrow Commc'n Labs., Inc. v. Pico Prods., Inc., 632 N.Y.S.2d 903, 905 (App. Div. 1995) (citation omitted). Where, however, the action seeks "not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession," such action is an equitable claim for restitution. Pereira v. Farace, 413 F.3d 330, 340 (2d Cir. 2005)

In an accounting proceeding, "the party submitting the account has the burden of proving that he or she has fully accounted for all the assets." In re Digiovanna 48 N.Y.S.3d 508, 509 (App. Div. 2017) (citation omitted). "This evidentiary burden does not change in the event the account is contested." Matter of Estate of Schnare, 594 N.Y.S.2d 827, 828 (App. Div. 1993). "While the party submitting objections bears the burden of coming forward with evidence to establish that the account is inaccurate or incomplete, upon satisfaction of that showing the accounting party must prove, by a fair preponderance of the evidence, that his or her account is accurate and complete." Id.

Ross has failed to submit a formal accounting to Butler. Ross never responded to Butler's September 24, 2015 demand for an accounting. Butler, 2017 WL 2963497, at *5. Nor has Ross

13

provided Butler with an accounting since this Court held that
Butler is entitled to one.

"Ordinarily the fiduciary's failure to satisfy his or her
burden of proving the accuracy or completeness of the account
results in that individual being surcharged with the amount of
the inaccuracies." Matter of Estate of Schnare, 584 N.Y.S.2d at
829.  But the court has "broad discretion to make such order or
decree as justice shall require." Id.  Here, both the plaintiff
and the defendant's accounts are incomplete and inaccurate.
Both parties have failed to keep reliable records.  The parties
have a history of hostility.  To accurately reconstruct the
account's activities over a confused two-decade history is
impossible.

Nevertheless, there is overwhelming evidence that Ross
controlled certain amounts of Butler's assets for her benefit.
The Lebenthal account is particularly telling.  Ross controlled
this account; it held securities in Butler's name; and on a
single day in 2006, at least $380,000 was liquidated from the
account.  Given the reliability of the account statement, even
if incomplete, Butler is owed at least the present value of the
assets listed on the third page of the Lebenthal statement minus
any repayments that have been given to her since 2006.

Butler is seeking $759,734.05 in restitution from Ross.
Although it is clear that Ross controlled part of Butler's

finances, there is not enough evidence to justify this amount. She urges the Court to add together the sums found in the letters, the handwritten Summary Accounting, the value of the bonds, and the amount missing from the Lebenthal account. This number takes into account the $18,000 Butler acknowledges having received from Ross, as well as the $1,800 in checks presented at trial. But Butler has no way of showing that there is no overlap between the amounts discussed in the letters, the Summary Accounting, the bonds purchased in or before 1987, and the Lebenthal account bonds from 2006. The evidentiary record does not allow this Court to decipher whether the documents are accounting for the same sums. The Lebenthal account is the most current and most reliable submission. It definitively shows that there were securities in Butler's name in an account controlled by Ross and that the total value of that account was liquidated in 2006.

At trial, Ross offered no evidence to dispute that the bonds held in the Lebenthal account represented investments he made with Butler's money and for her benefit. Instead, he argued that Butler may have received some or all of this money when she purchased her Montreal home in 2006, that she is not entitled to receive any money from him until he dies, and that he is too incompetent to proceed with a defense in this action.

None of these arguments has merit.  As noted, the issue of the defendant's competency is addressed at the end of this Opinion.

There is no evidence at all that Ross ever repaid Butler any funds that she gave to him to invest for her other than $28,000, and at trial another $1,800 in travelers checks.  Ross has offered no evidence that Butler used any other money returned by Ross to purchase her Canadian home.  Ross simply asserts that the purchase of Butler's Montreal home necessarily proves that any money she had given him was repaid.  Butler explained credibly at trial the sources of the down payment for the home and there is no reason to doubt her testimony.  The trial record establishes therefore that Butler purchased the property by using other funds.

Second, Ross has offered no evidence to support his theory that he and Butler had agreed that he could hold her money until he died and that she would only be entitled to recover her assets upon his death.  The trial evidence is entirely to the contrary.  As the letters of 1991 and 1993 reflect, Ross assured Butler that in the event her money had not been returned before his death, he had taken steps to ensure it would be returned after he died.  This is not, therefore, a dispute about entitlement to recovery under a will.

Ross also attempted at trial to revisit an issue that was decided at summary judgment: his status as Butler's fiduciary.

At summary judgment, the Court held that Ross was a fiduciary and that Butler was entitled to an accounting.  The purpose of the trial was to determine the amount of restitution damages Butler is entitled to.  Nevertheless, Ross attempted to refute this finding at trial.  He was, however, unsuccessful.  Indeed, Ross only helped to reinforce the determination of his status as fiduciary: by arguing that he was holding on to money for Butler, but only to be recovered upon his death, Ross essentially conceded that he held and controlled her finances. Ross also argued, in the alternative, that while he may have received money from Butler, any money given to him was given as a gift.  The evidence belies this theory.  Ross's letter to Butler indicate that he was investing her money for her benefit. Moreover, Ross opened accounts and bought bonds in Butler's name, something he would not have done had the money been a gift for him to keep as his own.

II. Prejudgment Interest

At trial, the Court noted that any award to Butler would be calculated with a prejudgment interest rate of nine percent, the New York statutory interest rate, <u>see</u> N.Y. C.P.L.R § 5004 (McKinney 2017).  The Court instructed the parties that they could raise objections to the application of this rate through written submissions.  Ross has objected, arguing that the Court should use its discretion to either deny any prejudgment

interest at all, or to deviate from the rate of nine percent. Ross notes that Butler did not specifically request prejudgment interest.

Under New York law, interest "shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." N.Y. C.P.L.R. § 5001(a) (McKinney 2017). Under this section, prejudgment interest is recoverable as a matter of right, with the exception that an award of interest on an equitable claim is discretionary. Id. Butler's claim of accounting is an equitable claim, Butler, 2017 WL 296349 at *4.

Here, prejudgment interest is not mandatory but the Court, in the exercise of its discretion, determines that prejudgment interest at the rate of nine percent is appropriate. The Court may impose this rate regardless of whether Butler specifically requested it. Malls v. Bankers Trust Co., 717 F.2d 683, 694 (2d Cir. 1983) ("[A] plaintiff's failure to pursue his request for prejudgment interest during the trial or even to demand such interest in his complaint does not amount to a waiver of his right to interest."). "[I]nterest shall be computed upon each item from the date it was incurred or upon all of the damages

from a single reasonable intermediate date." N.Y. C.P.L.R. §
5001(b) (McKinney 2017). Here, given that Butler's recovery is
limited to the bonds listed in the Lebenthal account, the
interest calculation is straightforward: prejudgment interest on
each bond should be calculated from its respective date of
maturity.

III. Doctrine of Laches

Ross urges that Butler's equitable accounting claim is
barred by the doctrine of laches. Laches is defined as "such
neglect or omission to assert a right as, taken in conjunction
with the lapse of time, more or less great, and other
circumstances causing prejudice to an adverse party, operates as
a bar in a court of equity." Capruso v. Village of Kings Point,
23 N.Y.3d 631, 641 (2014) (citation omitted). "The essential
element of this equitable defense is delay prejudicial to the
opposing party." Id. (citation omitted). "[T]he doctrine of
laches has no application when plaintiffs allege a continuing
wrong." Id. at 642 (citation omitted). The wrong alleged by
Butler was continuing until the moment of open repudiation.
Therefore, a laches analysis is not relevant until the time
after Ross's repudiation of his fiduciary obligation in
September 2015. See Butler, 2017 WL 2963497, at *6. A
September 1, 2017 Order limited Ross's laches argument to the

19

sixth month period between September 2015 and February 19, 2016, when Butler filed her complaint.

There is no minimum elapse of time necessary for a finding of laches. "Because the effect of delay on the adverse party may be crucial, delays of even under a year have been held sufficient to establish laches." Matter of Schulz v. State of New York, 81 N.Y.2d 336, 348 (1993). A court considers prejudice suffered by defendant. "Prejudice may be established by a showing of injury, change of position, loss of evidence, or some other disadvantage resulting from the delay." Skrodelis v. Norbergs, 707 N.Y.S.2d 197, 198 (App. Div. 2000).

Ross has not shown that the six-month delay between Ross's repudiation and Butler's filing of her complaint prejudiced him. Ross's main contentions with respect to this defense are that he is old and infirm and that documents have disappeared over the decades. Ross argues that his injury was suffered because of a lengthy delay of ten, twenty, or even more, years in filing the action. This assertion is beyond the scope of the six-month laches analysis. While Ross may be in ill health and his memory is fading, he has not shown that those conditions worsened, to the extent that he would be prejudiced, during the relevant period of time. There is nothing to show that Ross was prejudiced by Butler's (at most six month) delay in commencing this action. Butler is not guilty of laches.

IV. Doctrine of Unclean Hands

Ross argues that Butler's equitable accounting claim is barred by the doctrine of unclean hands. The doctrine of unclean hands applies only "when the complaining party shows that the offending party is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct." Filan v. Dellaria, 43 N.Y.S.3d 353, 359 (App. Div. 2016) (citation omitted).

In his pleadings, Ross contends that Butler demonstrated immoral and unconscionable conduct through direct and indirect "death threats." At trial, Ross did not introduce any evidence or argument with respect to his proposed unclean hands defense. He therefore abandoned this defense.

V. Incompetence

Ross is aged and in ill health. He attended the trial in a wheelchair, assisted by two aids. Ross complained at times that he was ill and wanted to go home. Defense counsel declined the option of letting Ross be taken home. While Ross sat quietly at times, at other times he coughed loudly, spat into tissues held by an aid, and asked to be taken out of his wheelchair and moved into a chair at counsel's table. Due to his disruptive

behavior, midway through the trial the Court directed that he be removed from the courtroom and taken to a witness room.

While Ross's counsel raised the issue of Ross's old age and ill health throughout motion practice with respect to the defense of laches, it was not until the eve of trial that Ross raised the issue of his competency to stand for trial.  In a September 25 letter, Ross requested a competency hearing, that the case be dismissed, or that a mistrial be declared due to Ross' illness.  The Court denied this request and proceeded with the trial.

Federal Rule 17(c) reads:

(c) Minor or Incompetent Person.
    (1) With a Representative. The following
    representatives may sue or defend on behalf of a minor
    or an incompetent person:
        (A) a general guardian;
        (B) a committee;
        (C) a conservator; or
        (D) a like fiduciary.
    (2) Without a Representative. A minor or an
    incompetent person who does not have a duly appointed
    representative may sue by a next friend or by a
    guardian ad litem.  The court must appoint a guardian
    ad litem -- or issue another appropriate order -- to
    protect a minor or incompetent person who is
    unrepresented in an action.

Fed. R. Civ. P. 17(c).  At trial, the Court invited Ross's counsel to, by the end of the week, provide evidence concerning Ross's alleged incompetency.  Such evidence could be

from an appropriate court of record or a relevant public
agency indicating that the party had been adjudicated
incompetent, or . . .  verifiable evidence from a mental

22

> health professional demonstrating that the party is being
> or has been treated for mental illness of the type that
> would render him or her legally incompetent.

*Ferrelli v. River Manor Health Care Center*, 323 F.3d 196, 201

(2d Cir. 2003).  Ross has failed to produce any such evidence.

Based on the Court's observations of Ross's demeanor at trial

and the lack of evidence to support any claim of incompetency,

the Court finds that Rule 17(c) does not apply.[5]

---

[5] In any event, even if Rule 17(c) did apply, a dismissal or
mistrial would not be the appropriate remedy.  The Rule
instructs a court to appoint a guardian for an unrepresented
party deemed to be incompetent.  Mr. Ross is represented by
counsel, and an attorney is considered a "representative."
*Berrios v. New Yrok City Housing Auth.*, 564 F.3d 130, 132 (2d
Cir. 2009).  See also *Cheung v. Youth Orchestra Foundation of
Buffalo, Inc,* 906 F.2d 59, 61 (2d. Cir. 1990) ("It goes without
saying that it is not in the interests of minors or incompetents
that they be represented by non-attorneys.").  The Fifth and
Sixth Circuits have made a distinction between legal
representation and representation for the purposes of Fed. R.
Civ. P 17.  See *Zaro v. Strauss*, 167 F.2d 218, 220 (5th Cir.
1948) (Under federal rule requiring appointment of guardian ad
litem for incompetent person "not otherwise represented,"
representation by counsel is insufficient.); *Noe v. True*, 507
F.2d 9, 12 (6th Cir. 1974) ("While it would not be at all
improper for the court, upon consideration, to appoint the
child's attorney as her guardian ad litem, the mere presence of
an attorney representing her in the action is insufficient of
itself to protect her personal interests in the action.")  The
Second Circuit has not followed suit.

**CONCLUSION**

Butler is entitled to $380,000 from Ross, based on the maturity value of the securities listed in the Lebenthal account summary from March 2006, with prejudgment interest at a rate of nine percent, calculated from the date of maturity of the respective securities, less $29,800.

Dated:    New York, New York
          October 3, 2017

_____
                    DENISE COTE
          United States District Judge